UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

JACQUELINE ANN STROBINO,

        Plaintiff,

  -against-                                                                 1:14-CV-0408 (LEK)

CAROLYN W. COLVIN,
Commissioner Of Social Security,

        Defendant.

_____

## MEMORANDUM-DECISION and ORDER

**I.    INTRODUCTION**

This case has proceeded in accordance with General Order 18, which sets forth the procedures to be followed in appealing a denial of Social Security benefits. Both parties have filed briefs. Dkt. Nos. 12 ("Plaintiff's Brief"); 13 ("Defendant's Brief"). For the following reasons, the judgment of the Social Security Administration ("SSA") is affirmed.

**II.    BACKGROUND**

    **A. Plaintiff's Medical Records**

Plaintiff Jacqueline A. Strobino Travis ("Plaintiff") has a long history of health issues including multiple anxiety disorders, depression, drug and alcohol abuse, lumbar pain, left knee pain, and left ankle pain. See Dkt. No. 10 ("Record") at 208.[1] Plaintiff claims that her medical conditions bar her from all gainful work activity. See R. at 50.

Plaintiff was first referred to Columbia County Mental Health ("CCMH") by her Probation Officer in February 1997, after she reported having "outbursts" and claimed to have been previously

---

[1] Citations to the Record are to the pagination assigned by the SSA.

treated for bipolar disorder at Duchess County Mental Health. R. at 216. Plaintiff had a history of alcohol and heroin abuse at the time of her admission. R. at 217. She denied having any hallucinations or suicidal thoughts, and otherwise appeared well-oriented, but admitted to general anxiety and sleep disturbances such as going to bed at midnight and waking in the middle of the night, sometimes for several hours at a time. R. at 218. A psychiatric social worker at CCMH diagnosed Plaintiff with bipolar I disorder, cocaine dependence, alcohol abuse, and antisocial personality disorder. R. at 220. Plaintiff was then scheduled to begin treatment at Twin Co. Alcohol and Substance Abuse Services on March 10, 1997. R. at 219.

Plaintiff was admitted to CCMH a second time on October 16, 2000, and referred to a different recovery program—an alcohol and substance abuse rehabilitation program, McPike, followed by a halfway house, Perrin House. R. at 221. An assessment by psychologist J. C. O'Leary ("O'Leary") on November 19, 2000 found Plaintiff's polysubstance and alcohol dependence to be in early full remission, ruled out bipolar I disorder, and determined Plaintiff's primary diagnosis to be Borderline Personality Disorder. R. at 223-24. O'Leary noted that Plaintiff had a long history of dramatic mood changes, rash judgments, anti-social behaviors, and drug and alcohol abuse, and appeared anxious, distracted, and disheveled during her mental evaluation. R. at 226-28. Plaintiff was prescribed medication for symptoms of anxiety and depression. R. at 293. Plaintiff remained at McPike from December 5 until December 27, 2000, then moved to Perrin House, and finally returned to CCMH in April 2001 following completion of her treatment program. R. at 231. Plaintiff was prescribed a number of medications for anxiety and depression through March 2003 . R. at 292-93.

Plaintiff was later treated at Westchester Medical Center ("WMC") for second-degree burns and other injuries resulting from a house fire in April 2005. R. at 297. In this incident, Plaintiff's hair and arms caught on fire, and she burned her hands while attempting to put it out. R. at 301. She was able to escape the house after fifteen minutes by breaking out of a window, but sustained slight nasal burns and smoke inhalation before she escaped. Id. The burns were primarily to Plaintiff's right hand and shoulder. Id. Plaintiff complained of pain in the burned hand, but not the burned shoulder. Id. Physician Dr. Erin Corridon examined Plaintiff at the hospital and diagnosed her with smoke inhalation and second-degree burns on her hands and shoulders. R. at 319. Plaintiff was administered multiple medications to treat her injuries from the fire, R. at 318, and was discharged from WMC following completion of her treatment on April 24, 2005, R. at 295.

CCMH records from 2004 and 2005 reveal Plaintiff's continued history of alcohol and substance abuse and denial of a need for treatment, as well as an explosive temper, poor judgment, and poor impulse control. R. at 330-31. Dr. Carl Rinzler ("Dr. Rinzler") made an additional diagnosis of Dysthymic Disorder following Plaintiff's readmission to CCMH on December 21, 2004, after Plaintiff reported significant impairment in daily life functioning due to a chronically depressed mood over a two-year period, and issues with anger management. See R. at 339, 356-57, 363. Plaintiff claimed that these symptoms were partially brought on as a result of the house fire, which caused her aforementioned burns, as well as sleeplessness and obsessive and anxious thoughts. R. at 341. Plaintiff was prescribed medication to help manage her anxiety and sleeplessness. Id. Plaintiff later visited CCMH's emergency room in 2006 for anxiety and a panic attack. R. at 367. A few months later, Dr. Rinzler noted Plaintiff's continued non-compliance with

mental health and substance abuse treatment by failing to appear for various appointments after intake.  R. at 376, 380.

Plaintiff visited the emergency room again on May 10, 2006, and complained of back pain.  R. at 369.  Physician's Assistant ("PA") Todd Santiago noted that the pain was severe and had begun the previous day following a fall, and that Plaintiff had no history of chronic pain or a degenerative spine.  Id.  The pain radiated to the bilateral upper legs and was worsened by any bending, turning, or twisting.  Id.  Plaintiff complained of leg numbness but denied experiencing leg weakness or other symptoms.  Id.  Over-the-counter medication did not improve Plaintiff's condition, and she was prescribed medication for pain relief after radiology testing discovered minimal degenerative spondylosis in the lumber spine.  R. at 370-71.

Plaintiff returned to Columbia Memorial Hospital on three separate occasions in May 2011 for ankle pain.  R. at 404, 409, 413.  PA David Demboski ("Demboski") treated Plaintiff for left ankle pain after she fell down some stairs at home while taking out the garbage.  R. at 404.  Plaintiff had trouble bearing weight on the ankle and was diagnosed with swelling of lateral soft tissue but no fracture.  R. at 406.  Plaintiff was given medication during treatment and prescribed additional medication as needed for pain.  R. at 405.  She returned a few days later on May 22, 2011, complaining of continued ankle pain and stating that it was preventing her from sleeping at night.  R. at 409.  Demboski again prescribed Plaintiff medication for her ankle sprain.  R. at 410.  Plaintiff returned a third time on May 26 due to lack of improvement of the ankle, and she was prescribed pain medication.  R. at 414.  Her ankle remained tender and colored purple and brown due to bruising.  Id.

Plaintiff next saw Dr. Christopher Gorczynski ("Dr. Gorczynski") at Columbia Memorial

Bone and Joint on June 6, 2011, regarding her ankle. R. at 425-26. Dr. Gorczynski noted pain in the entirety of Plaintiff's left ankle, which occasionally radiated up the entirety of her left leg, there was tingling in the bottom of her foot, and the pain was aggravated by weight bearing, walking, and any other movements. R. at 425. An x-ray revealed that the ankle had no fracture or deformity, but Plaintiff was prescribed pain medication, fitted with a walker boot, and given a home exercise program to help treat the pain. R. at 426. Plaintiff went to CMH Rehab Services for physical therapy treatment for the ankle on June 29, 2011. R. at 437.

A consultative orthopedic examination by Dr. Suraj Malhotra ("Dr. Malhotra") was conducted on June 13, 2011, after Plaintiff was referred to him by the Division of Disability Determination. R. at 427. Dr. Malhotra diagnosed Plaintiff with lumbosacral spine region pain and possible diskogenic disease, pain in the left knee with possible internal derangement, and a recently sprained left ankle. R. at 429. The examination determined that Plaintiff had a mild limitation in walking and moderate bending limitations in her left knee and ankle. R. at 430. A lumbosacral spine x-ray showed that there were no significant structural bony abnormalities, as the height of the vertebral bodies and intervertebral disc spaces were relatively well maintained. R. at 431.

A consultative psychiatric evaluation of Plaintiff by Dr. Seth Rigberg ("Dr. Rigberg") on June 28, 2011, determined that Plaintiff remained depressed and anxious but had seemingly remained sober from cocaine and alcohol for the previous five years. See R. at 433, 435. At this evaluation, Plaintiff reiterated a loss in enjoyment of life and problems with panic attacks while in public. R. at 433. Dr. Rigberg diagnosed Plaintiff with panic disorder with agoraphobia, major depressive disorder, post-traumatic stress disorder ("PTSD"), and generalized anxiety disorder. R. at 435. Dr. Rigberg noted that Plaintiff was able to follow and understand simple directions and

perform tasks independently but on an inconsistent basis.  Id.  He also noted that she would have trouble maintaining a regular schedule, need extra time to learn new tasks, and be unable to independently perform complex tasks.  Id.  According to Dr. Rigberg, Plaintiff's psychiatric problems were the kind that "may significantly interfere with her ability to function on a daily basis."  Id.

State agency Single Decision Maker ("SDM") M. Mayer ("Mayer") made a physical residual functional capacity ("RFC") assessment of Plaintiff on August 3, 2011.  R. at 71.  Mayer found that Plaintiff could occasionally lift or carry twenty pounds, frequently lift or carry ten pounds, stand or walk for at least two hours in an eight hour workday, sit for a total of six hours in an eight hour workday, and push or pull without limitations in using her upper and lower extremities.  R. at 67.  Mayer also noted that Plaintiff had no manipulative, visual, communicative, or environmental limitations.  R. at 68-69.  However, he found that Plaintiff suffered from various occasional postural limitations involving climbing, balancing, and stooping.  R. at 68.

State agency non-examining psychiatrist Dr. Dambrocia concluded on August 18, 2011, that Plaintiff still suffered from major depressive disorder, PTSD, generalized anxiety disorder, and panic disorder with agoraphobia.  R. at 444, 446.  With respect to Plaintiff's possible functional limitations, Dr. Dambrocia determined that Plaintiff's psychiatric issues would cause mild restriction of activities of daily living, moderate difficulties in maintaining social functioning, and mild difficulties in maintaining concentration, persistence, or pace.  R. at 451.  He also found that Plaintiff would be moderately limited in performing within a regular schedule, the ability to complete a normal workday and workweek without interruptions from psychological symptoms, the ability to interact appropriately with the general public, the ability to respond appropriately to

6

changes in the work setting, and the ability to travel in unfamiliar places or use public transportation. R. at 455-56.

Hudson Medical Care office notes from the same day show that Plaintiff was evaluated by nurse practitioner Marilyn Miller ("Miller") after again complaining of having trouble sleeping, back pain, and left leg pain. R. at 467. Plaintiff underwent x-rays of her chest, abdomen, hip, lower back, and knee and was prescribed Clonidine tablets and Prilosec delayed release capsules to combat her insomnia. R. at 468.

Plaintiff visited the Columbia Memorial Hospital emergency room four more times between July 2011 and April 2012. R. at 469, 496, 502, 517. PA Cassandra Sobkiw-Kurtz ("Sobkiw-Kurtz") treated Plaintiff on July 30, 2011, primarily for her back pain, treating her with Morphine and Zofran and prescribing Flexeril and Prednisone to help decrease inflammation. R. at 522. Plaintiff claimed to be off of drugs and alcohol, but the medical report noted that her urine sample was suspicious since the results were negative for drugs, even though she had taken Percocet that morning. R. at 527. Plaintiff returned to the emergency room on August 28, 2011, after experiencing abdominal pain, and was treated by Dr. John Keene ("Dr. Keene"). R. at 503. Dr. Keene prescribed Doxycycline, Flagyl, and Lortab, and testing determined that everything appeared normal in Plaintiff's abdominal region. R. at 511-12. Plaintiff returned a third time on March 26, 2012, complaining of a painful lump under her arm and chest pain. R. at 497. Sobkiw-Kurtz prescribed medication for the pain and performed a chest x-ray before diagnosing Plaintiff with a chest wall strain. R. at 499. Plaintiff was discharged the same day after she claimed to feel much better. R. at 500. Plaintiff visited the emergency room a final time on April 17, 2012, again complaining of chest pain to Dr. Michael Weisberg ("Dr. Weisberg"). R. at 530. Dr. Weisberg

prescribed Zithromax, Zantac, and Prednisone and found that, while there was mild elevation of the left hemidiaphragm and possible atelectasis, the tests on Plaintiff's chest were otherwise unremarkable. R. at 541.

Hudson Medical Care office notes from August 30, 2012, show that Plaintiff was again evaluated by Miller after she claimed her medications were not working, and requested a prescription for Prilosec because of her constant physical pain. R. at 546. Plaintiff was found to still have lumbago, acute knee pain, and hip pain, was prescribed Prilosec for the lumbago, and was referred to an orthopedist for back, knee, ankle, and hip pain. R. at 546-47.

Plaintiff returned to the Bone and Joint Center a month later in September 2012 after re-injuring her left knee and ankle when her leg gave out and she fell on top of the ankle. R. at 548. Plaintiff claimed her knee had been bothering her since she was fifteen years old following a horseback riding accident, causing it to become chronically painful and unstable. Id. Dr. Scott Pregent diagnosed Plaintiff with an ankle sprain, chronic instability of the left knee, and patellofemoral pain syndrome in the left knee, but x-rays showed no fractures or lesions of the knee or ankle. R. at 549-50. Plaintiff was given an ankle brace and prescribed physical therapy for the ankle pain and knee instability. R. at 549.

Plaintiff was also diagnosed at the Spine Institute with spondylolisthesis by Dr. Ersno Eromo following complaints of continued back pain and a spinal x-ray on September 17, 2012. R. at 552. After Plaintiff was also found to have degenerative disc disease the following month, Dr. Tomasz Andrejuk ("Dr. Andrejuk") of Columbia Memorial Pain Management performed a procedure on Plaintiff's back to alleviate discomfort on October 24, 2012. R. at 556. Plaintiff tolerated the procedure well and claimed it reduced her discomfort. Id. Dr. Andrejuk further diagnosed Plaintiff

8

with fibromyalgia muscle pain and bursitis of the right shoulder and hip after a musculoskeletal evaluation showed general tenderness of the neck, head, shoulders, arms, spine, hips, and legs. R. at 559.

**B. ALJ Hearing**

On April 20, 2011, Plaintiff filed an application for supplementary security income, alleging disability beginning November 1, 2006, due to pain and discomfort from anxiety, depression, and physical impairments including lumbar, left knee, and left ankle pain. R. at 16, 208. The SSA denied the application on August 8, 2011, and Plaintiff subsequently filed a written request for a hearing before an Administrative Law Judge ("ALJ") on October 18, 2011. R. at 16. On September 13, 2012, ALJ Robert Wright conducted a hearing regarding Plaintiff's claim with her counsel and impartial vocational expert ("VE") Peter A. Manzi ("Manzi") present.[2] Id.

ALJ Wright asked Plaintiff questions pertaining to her work capabilities, current medical state, and daily life activities. R. at 42-51. Plaintiff claimed that though she could not recall definitively at which point she last worked, her previous employment position as a housekeeper ended sometime between 1999 and 2002. R. at 39-40. Plaintiff testified that she had stopped working due to panic attacks and incarceration. R. at 41. When asked why she felt she was unable to work, Plaintiff testified that her panic attacks keep her from getting a job and that she is unable to stand for more than one hour due to physical pain in her back and right leg from degenerative arthritis and general instability of her left knee. R. at 50-51. Plaintiff testified that on a typical day she mostly stays inside her apartment to watch TV, but performs household chores like cooking and

---

[2] The VE is referred to in the Record as both "Manzi" and "Mansy." The Court adopts the spelling used in the ALJ's decision. See R. at 16.

9

light cleaning. R. at 45. While grocery shopping and laundry are too difficult for Plaintiff to do alone due to her panic attacks and physical pains, Plaintiff is able to walk up the street and back to pick up her mail, as well as take trips to visit her aunt in Hudson, New York. R. at 45-46, 48-49.

After the ALJ's questioning, Plaintiff's counsel further inquired into Plaintiff's medical status and functional capacity. R. at 52-57. Counsel asked about Plaintiff's ability to sit, walk, and lift. R. at 51-53. Plaintiff claimed she could only sit for around forty minutes, lift a bit more than the weight of a gallon of milk, and walk about a half a block before experiencing back pain. Id. Plaintiff also had experienced a burn on her right shoulder in 2005 that she claimed sometimes causes a sharp pain in her right shoulder. R. at 54. Plaintiff's attorney also inquired into Plaintiff's panic attacks, which she stated could last as long as forty-five minutes. R. at 57.

VE Manzi then testified regarding Plaintiff's prior work experience. R. at 61. Plaintiff had done light and unskilled work as a housekeeper, and medium and semi-skilled work as a presser. Id. Given a residual functional capacity ("RFC") by the ALJ of light, unskilled work in a low-stress job with only occasional decision making, changes in work setting or interaction with others, Manzi determined that Plaintiff would be able to perform her past job as a housekeeper. R. at 62. Given a second RFC with the additional limitation of sedentary work, the VE determined that Plaintiff had no past relevant work experience, but could perform other jobs in the national and local economy such as a general assembler, an addresser, and a table worker. R. at 62-63. Finally, the ALJ provided a third RFC with the additional limitation of being off task twenty-five percent of the time, and the VE determined that there would be no work available under those circumstances. Id.

### C. The ALJ's Decision

ALJ Robert Wright issued a decision denying Plaintiff's application for disability and

10

supplemental security income ("SSI"). R. at 16. The ALJ found that Plaintiff had not engaged in any substantial gainful activity since April 20, 2011. R. at 18. The ALJ then found that Plaintiff did suffer from severe impediments, including lumbar spondylosis, affective disorders, and anxiety. Id. The ALJ did not find that Plaintiff had any impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. § 404(P), Appendix I. R. at 22. The ALJ found that Plaintiff had the RFC to perform unskilled light work in a low-stress job such as one with only occasional decision making, changes in the work setting, or interactions with others. R. at 24. This determination was based on the fact that Plaintiff could still perform this type of work even if limited to sitting, standing, and walking six hours each in an eight-hour workday, and lifting twenty pounds occasionally and ten pounds frequently. R. at 27. The ALJ then determined that Plaintiff "lacks no past relevant work, as her earnings record lacks any earnings at the substantial gainful activity level." Id. VE Manzi found that jobs including cleaner/housekeeper, general assembler, addressor, and table worker did exist in the national and local economy for an individual of Plaintiff's age, education, work experience, and established RFC. R. at 28. As a result, the ALJ concluded that Plaintiff was not disabled by the standards set forth in the Social Security Act. R. at 29.

    Plaintiff filed a review request on November 1, 2012. R. at 1. On February 12, 2014, the ALJ decision became the final decision of the Commissioner when the Appeals Council denied the request for review. R. at 1-3. Plaintiff filed a timely appeal on April 11, 2014. Dkt. No. 1 ("Complaint").

## III. LEGAL STANDARD

### A. Standard of Review

When a court reviews the SSA's final decision, it determines whether the ALJ applied the correct legal standards and if the ALJ's decision is supported by substantial evidence in the record. 42 U.S.C. § 405(g); Roat v. Barnhart, 717 F. Supp. 2d 241, 248 (N.D.N.Y. 2010) (Kahn, J.) (citing Berry v. Schweiker, 675 F.2d 464, 467 (2d Cir. 1982)). Substantial evidence amounts to "more than a mere scintilla," and it must reasonably support the decision-maker's conclusion. Halloran v. Barnhart, 362 F.3d 28, 31 (2d Cir. 2004) (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)). The Court defers to the Commissioner's decision if it is supported by substantial evidence, "even if it might justifiably have reached a different result upon a *de novo* review." Sixberry v. Colvin, No. 12-CV-1231, 2013 WL 5310209, at *3 (N.D.N.Y. Sept. 20, 2013) (quoting Valente v. Sec'y of Health and Human Servs., 733 F.2d 1037, 1041 (2d Cir. 1984)). However, the Court should not uphold the ALJ's decision when there is substantial evidence to support his decision, but it is not clear that the ALJ applied the correct legal standards. Johnson v. Bowen, 817 F.2d 983, 986 (2d Cir. 1987).

### B. Standard for Benefits

According to SSA regulations, disability is "the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 404.1505(a). An individual seeking disability benefits "need not be completely helpless or unable to function." De Leon v. Sec'y of Health and Human Servs., 734 F.2d 930, 935 (2d Cir. 1984) (quoting Gold v. Sec'y of Health, Educ. and Welfare, 463 F.2d 38,

41 n.6 (2d Cir. 1972)). In order to receive disability benefits, a claimant must satisfy the requirements set forth in the SSA's five-step sequential evaluation process. 20 C.F.R. § 404.1520(a)(1). In the first four steps, the claimant bears the burden of proof; at step five, the burden shifts to the SSA. Kohler v. Astrue, 546 F.3d 260, 265 (2d Cir. 2008) (quoting Perez v. Chater, 77 F.3d 41, 46 (2d Cir. 1996)). If the SSA is able to determine that Plaintiff is disabled or not disabled at any step, the evaluation ends. 20 C.F.R. § 404.1520(a)(4). Otherwise, the SSA will proceed to the next step. Id.

At step one, the SSA considers claimant's current work activity to see if it amounts to "substantial gainful activity." 20 C.F.R. § 404.1520(a)(4)(I). If it does, claimant is not disabled under SSA standards. Id. At step two, the SSA considers whether claimant has a severe medically determinable physical or mental impairment, or combination of impairments that is severe, that meets the duration requirement in § 404.1509. Id. § 404.1520(a)(4)(ii). If she does not have such impairment, claimant is not disabled under SSA standards. Id. At step three, the SSA considers the severity of claimant's medically determinable physical or mental impairment(s) to see if it meets or equals an impairment and the requisite duration listed in 20 C.F.R. § 404(P), Appendix I. Id. § 404.1520(a)(4)(iii). If it does not, the SSA moves on to step four to review claimant's RFC and past relevant work. Id. § 404.1520(a)(4)(iv). Claimant is not disabled under SSA standards if the RFC reveals that claimant can perform past relevant work. Id. If claimant cannot perform her past relevant work, the SSA decides at step five whether adjustments can be made to allow claimant to work somewhere in a different capacity. Id. § 404.1520(a)(4)(v). If appropriate work does not exist, then the SSA considers claimant to be disabled. Id.

13

## IV. DISCUSSION

Plaintiff argues that: (1) the ALJ failed to adhere to Social Security Ruling 96-6p by ignoring the opinion of state agency SDM Mayer, which suggested Plaintiff was limited to sedentary work; and (2) the ALJ's determination of Plaintiff's RFC is not supported by substantial evidence in the record based on the opinions and conclusions of Dr. Dambrocia and Dr. Rinsberg. Pl.'s Br. at 3-5.

### A. Evidentiary Weight of Opinion of a Non-Physician, Single Decision Maker

When considering a claim for SSI due to disability, the ALJ must comply with SSR 96-6p by considering and explaining the weight given to the opinions of "[s]tate agency medical and psychological consultants and other program physicians and psychologists regarding the nature and severity of an individual's impairment(s)." See SSR 96-6p (S.S.A. July 2, 1996). State agency medical and psychological consultants are experts who are highly qualified physicians and psychologists. See id.

There is no evidence that Mayer is either a trained physician or psychologist, or that he personally examined Plaintiff when recording his RFC evaluation. R. at 66-72. Indeed, the record clearly shows that Mayer is not a physician and did not personally examine Plaintiff. Id. The physical RFC assessment document filled out by Mayer on behalf of Plaintiff shows under the signature section that Mayer's role was one not of a Medical Consultant ("MC"), but of a SDM. R. at 71. The same document also described Mayer as a disability examiner from a state agency as opposed to a physician or medical specialist. R. at 72. Plaintiff therefore erred in referencing SSR 96-6p, as it refers only to medical and psychological state agency consultants and other program physicians or psychologists, and not to SDMs. See SSR 96-6p.

Despite this, Plaintiff claims that the ALJ still should have accounted for the determination

14

of the SDM and provided a justification for why the SDM's determination was rejected. See Pl.'s Br. at 3. However, courts in this district have previously determined that SDMs are non-physician disability examiners whose RFC determinations are not to be afforded any evidentiary weight at the administrative hearing level, and that affording such an RFC determination any evidentiary weight at all constitutes error. See, e.g., Martin v. Astrue, No. 10-CV-1113, 2012 WL 4107818, at *15 (N.D.N.Y. Sept. 19, 2012).

The ALJ thus acted appropriately in not considering the RFC determination made by the SDM in the instant case. R. at 24-27. The ALJ correctly incorporated the medical evidence and other evidence in the record, including the opinion of consultative examiner Dr. Suraj Malhotra and the examination by Dr. Scott Pregont, which support his conclusion that Plaintiff possesses a physical RFC for light work. R. at 24-27, 427-31, 548-50.

**B. The ALJ's RFC Finding and Substantial Evidence**

Plaintiff next argues that the ALJ's RFC determination is not supported by substantial evidence due to the ALJ's: (1) failure to give any weight to Mayer's opinion; (2) giving significant weight to the opinion of consultative psychological examiner Dr. Rigberg; and (3) giving greatest weight to the opinion of state agency psychological consultant Dr. Dambrocia while failing to account for Dr. Dambrocia's determination that Plaintiff was "moderately limited" in several aspects. See Pl.'s Br. at 4-5.

As part of the evaluation process, a claimant's RFC must be determined before applying step four of the disability benefits test. See 20 C.F.R. § 416.920(e). A claimant's RFC represents that individual's ability to sustain physical and mental work activities despite the limitations placed on her due to her impairments. 20 C.F.R. § 416.945(a)(1). The RFC is determined by the ALJ's

15

consideration of all of a claimant's impairments and all relevant medical and other evidence. 20 C.F.R. § 416.945(a)(3).

The ALJ properly considered the opinion of consultative examiner Dr. Rigberg by giving it significant weight, but declining to incorporate it in its entirety. R. at 26. He instead determined that Dr. Dambrocia's opinion was of greater probative value and more consistent overall with the evidence in the record. Id. "There is no requirement that the agency accept the opinion of a consultative examiner concerning a claimant's limitations." Pellam v. Astrue, 508 F. App'x 87, 89-90 (2d Cir. 2013). Thus, the ALJ was not required to adopt some of the less clear parts of Dr. Rigberg's opinion, such as his finding that Plaintiff was "inconsistently" able to follow and understand simple directions and instructions and perform simple tasks, possibly had "some trouble consistently maintaining attention and concentration for tasks and maintaining a regular schedule," and was "able to relate adequately with others, as long as these interactions are emotionally supportive and non-threatening." See R. at 26, 435. Although the ALJ correctly declined to adopt these findings from Dr. Rigberg, his opinion largely supported the ALJ's RFC determination, and was properly given significant weight. R. at 26, 432-36; see also Pellam, 508 F. App'x at 89-90 (holding that, even though the ALJ justifiably discredited part of the consultative examiner's findings because he was not required to accept the opinion regarding the claimant's limitations, the consultative examiner's overall findings were otherwise supportive of the ALJ's RFC determination).

The ALJ also properly considered that the examination performed by Dr. Rigberg did not uncover determinations that would establish Plaintiff's asserted limitations. See R. at 23, 26-27, 434; 20 C.F.R. § 416.927(c)(3)-(4). Dr. Rigberg found that Plaintiff's affect was depressed and

16

anxious, her mood was dysthymic and anxious, her attention and concentration and recent and remote memory skills were impaired, her cognitive functioning was below average, and her insight and judgment were poor. R. at 434. Despite these conditions, however, Dr. Rigberg also found that Plaintiff was cooperative and adequately sociable, demonstrated normal posture and motor behavior, had focused eye contact, displayed fluent and clear language, showed no signs of hallucinations or paranoia, was alert and oriented, and her attention and memory impairments were only minor. Id. Further, Plaintiff disclosed that she was still able to dress, bathe, and groom herself, as well as do some chores like preparing simple food and shopping, and remain committed to a healthy relationship with her partner. R. at 434-35. Thus, parts of Dr. Rigberg's evaluation were formed by relying on Plaintiff's own personal symptom reports instead of objective conclusions, and were therefore properly omitted by the ALJ. See R. at 432-36; 20 C.F.R. § 416.927(c)(3).

The ALJ also correctly adopted the evaluation of state agency medical consultant Dr. Dambrocia, who reviewed Dr. Rigberg's report and the rest of the evidence in the Record. See R. at 23, 26, 457. Plaintiff reiterates the fact that Dr. Dambrocia found her to be "moderately limited" in multiple categories within Section I of the mental RFC assessment form, and asserts that the ALJ needed to account for Dr. Dambrocia's checkbox responses from Section I of the form. See Pl.'s Br. at 4-5; R. at 455-56. However, the Program Operations Manual System ("POMS") clearly states that Section I of the form is only to be used as a worksheet to help decide any possible functional limitations and does not itself constitute an assessment of the RFC. POMS DI 24510.060(B)(2)(b). The POMS states that Section III (Functional Capacity Assessment) is the section within which the actual mental RFC is determined, which is what the ALJ must consider in determining Plaintiff's ability to perform mental work. POMS DI 24510.060(B)(4); POMS DI 25020.010(B). According

to the POMS, "moderately limited" does not mean that Plaintiff's capacity is at a level that is unacceptable to the workforce, and the capacity or limitation must be detailed in Section III. See Smith v. Comm'r of Soc. Sec., 631 F.3d 632, 636-37 (3d Cir. 2010). Other courts have similarly found that "moderately limited" activities as determined by state agency review psychologists' mental RFC assessments do not represent Plaintiff's actual RFC. See, e.g., Ferguson v. Astrue, No. 09-CV-697S, 2010 WL 7746198, at *6-7 (W.D.N.Y. July 30, 2010).

In the instant case, Dr. Dambrocia recorded in Section III that Plaintiff was able to comprehend instruction and sustain concentration for tasks, but also may have difficulty relating to others or adapting to changing circumstances, and would benefit from a low-contact atmosphere. R. at 26, 457. The ALJ properly accorded Dr. Dambrocia's assessment significant weight since his opinion supports the ALJ's mental RFC determination for unskilled work in a low-stress occupation. R. at 23-27. According significant weight to the opinion is further supported by the fact that Plaintiff was found to possess adequate social skills, good eye contact and motor skills, minor issues with attention and concentration abilities, and the ability to perform numerous activities, which all support Dr. Dambrocia's opinion. See R. at 23, 26, 45-48, 50, 434-35, 184-89, 191, 457; 20 C.F.R. § 416.927(c)(3)-(6). Dr. Dambrocia is a highly qualified psychologist who is adept at evaluating medical issues in disability claims. See 20 C.F.R. § 416.927(e)(2). Furthermore, state agency MC opinions can constitute substantial evidence that support the findings of the ALJ. See Frye ex rel. A.O. v. Astrue, 485 F. App'x 484, 487 (2d Cir. 2012); Lamond v. Astrue, 440 F. App'x 17, 20 (2d Cir. 2011); Diaz v. Shalala, 59 F.3d 307, 313 n.5 (2d Cir. 1995) (citing Schisler v. Sullivan, 3 F.3d 563, 567-68 (2d Cir. 1993)); see also SSR 96-6p.

In conclusion, the ALJ was correct in his determination of Plaintiff's RFC because he

properly evaluated all of the relevant evidence, and his RFC determination is supported by substantial evidence in the Record. See 20 C.F.R. § 416.945(a).

## V. CONCLUSION

Accordingly, it is hereby:

**ORDERED**, that the decision of the Commissioner is **AFFIRMED**; and it is further

**ORDERED**, that the Clerk of the Court serve a copy of this Memorandum-Decision and Order on all parties in accordance with the local rules.

**IT IS SO ORDERED**.

DATED: August 04, 2015
Albany, New York

Lawrence E. Kahn
U.S. District Judge